IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAWN WAGNER, )
)
Plaintiff, )
) Civil Action No.: 09 C 7591
v. )
) Suzanne B. Conlon, Judge
BOARD OF TRUSTEES OF THE )
UNIVERSITY OF ILLINOIS, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Dawn Wagner sues the Board of Trustees of the University of Illinois ("the Board") for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Wagner also brings a claim for breach of contract, alleging the Board's termination of her employment violated the progressive discipline policy set forth in a collective bargaining agreement. The Board moves for summary judgment. For the following reasons, the motion is granted.

## BACKGROUND

### I. Local Rule 56.1

The court derives the facts from the parties' Local Rule 56.1 statements and exhibits. Local Rule 56.1 assists the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposes to prove a disputed fact with admissible evidence. *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). The Board complains that Wagner has not complied with Local Rule 56.1's requirements. In particular, Wagner's statement of additional facts is rife with conclusory allegations, irrelevant

evidence, improper argument, and "facts" not supported by the record. Wagner's factual statements and supporting affidavits contain inadmissible hearsay. *See, e.g.*, Pl. Facts ¶¶ 78, 99. In some respects, Wagner's supporting affidavit contradicts her earlier deposition testimony. *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) (plaintiff cannot create a material dispute by contradicting her deposition testimony with later-filed affidavits).

The court will not consider any statements or responses containing legal conclusions, argument or hearsay, or that are not based on personal knowledge. The court will also disregard irrelevant material and factual statements not supported by record evidence. The Board's motion to strike portions of Wagner's summary judgment response is therefore moot. *Alvarado v. Corporate Cleaning Serv., Inc.*, No. 07 C 6361, 2010 WL 2523432, at *13 n. 2 (N.D. Ill. June 21, 2010) (Dow, J.).

## II.  Relevant Facts

Wagner, an African-American nurse, began working for the University of Illinois Medical Center ("the hospital") in November 2002. Def. Facts ¶ 6. She was hired by Catherine O'Neill, the hospital's associate director of nursing. *Id.* ¶ 7. In 2006, O'Neill and other members of hospital management began to address concerns about Wagner's work performance.

In May 2006, O'Neill issued Wagner notice of a pre-disciplinary action meeting to discuss Wagner's poor clinical nursing practice, her inappropriate and disrespectful behavior toward a patient's family member, and her failure to uphold the hospital's service values. Def. Facts ¶ 16. The notice outlined three separate complaints lodged against Wagner during a single shift on April 30, 2006. *Id.* The sister of a terminal cancer patient complained that Wagner refused to provide the patient with a bed pan, telling her, "you can get up to go to the bathroom."

2

Def. Facts ¶ 17. Instead of giving the patient an enema to relieve constipation, Wagner directed the patient's sister to do it. *Id.*; Def. Ex. A, Part 5 (Wagner Dep. Ex. 4). After the patient soiled herself and the bed, Wagner instructed the sister to clean it up "because the nurse did not do it." Def. Facts ¶ 17.[1]

Another patient, suffering from diarrhea and rectal bleeding, complained after Wagner refused her repeated requests for a medicated cream. Def. Facts ¶ 18; Def. Ex. A, Part 5 (Wagner Dep. Ex. 4). The third complaint was brought by a patient who reported that Wagner "was yelling at her and very rude." Def. Ex. A, Part 5 (Wagner Dep. Ex. 4). At the pre-disciplinary meeting, O'Neill made Wagner aware of the complaints and gave her the opportunity to respond. Def. Facts ¶ 19. Wagner did not acknowledge any wrongdoing on her part. *Id.* ¶ 20. O'Neill advised Wagner that she needed to provide better patient care. *Id.* ¶ 21.

On December 12, 2007, the hospital cited Wagner after she gave the wrong medication to a patient. Def. Facts ¶ 22.[2] Wagner was reminded to follow the hospital's medication procedures, including the use of two patient identifiers and the "5 R's" – right patient, right medicine, right dosage, right route, and right time. *Id.* ¶¶ 23-24; Def. Ex. A, Part 5 (Wagner Dep. Ex. 5). On January 26, 2008, hospital management cited Wagner after she used a "baby

---

[1] As with nearly all the complaints made against her, Wagner denies the truth of the underlying allegations. However, she does not dispute that the complaints were in fact made.

[2] Wagner objects to this proffered fact as "vague and irrelevant." It is neither. Regardless of whether the citation constituted formal discipline, the incident is relevant to the Board's honest view of Wagner's performance.

3

unregistered" code to override a patient's medication, in violation of the hospital's safety guidelines. Def. Facts ¶¶ 25-26.³

Two weeks later, O'Neill provided Wagner with notice of another pre-disciplinary action meeting to address Wagner's substandard patient care. *Id.* ¶ 28. In addition to the December 12th citation, the meeting was also to discuss an incident that occurred on January 29, 2008. *Id.*; Def. Ex. A, Part 5 (Wagner Dep. Ex. 7). On that date, several nurses, including the unit director, reported that Wagner administered the wrong medication to a bone marrow transplant patient. Def. Facts ¶ 27; Def. Ex. A, Part 5 (Wagner Dep. Ex. 5). In March 2008, O'Neill issued Wagner a letter of warning after determining that Wagner had twice administered the wrong medication to patients and failed to follow the appropriate safety measures. Def. Facts ¶¶ 29-30. The warning stated that further transgressions would result in more severe disciplinary action. *Id.* ¶ 31.

In August 2008, the hospital cited Wagner again, this time for excessive tardiness and complaining about her work assignments. Def. Facts ¶ 32. In the two months preceding the citation, Wagner had been assigned to work 39 shifts; she was late on 34 occasions. *Id.* ¶ 33. Although Wagner admitted her tardiness was a problem, she denied complaining about her assignments. Def. Ex. A, Part 5 (Wagner Dep. Ex. 9). Nevertheless, O'Neill continued to receive reports from night shift charge nurses that Wagner was unwilling to assist her colleagues and was complaining about patient assignments. Def. Facts ¶ 34. One nurse complained to hospital management that Wagner refused to attend to a sick patient so as to evenly distribute the

---

³ Wagner admits she may have used the code in error, but denies that this amounted to a violation of safety regulations. Pl. Resp. ¶ 25. Her denial is not supported by record evidence. To the contrary, Wagner acknowledged in her deposition testimony that such an error violated hospital policy and safety guidelines. Def. Ex. A, Part I (Wagner Dep. at 115:20-23).

4

work load among the nurses. *Id.* ¶ 35. Management directed Wagner to comply with the charge nurse's instructions. *Id.*

On March 5, 2009, Wagner was cited for failing to promptly return to work after a training session and failing to inform her supervisors of her whereabouts. Def. Facts ¶ 36. Later that month, O'Neill issued Wagner notice of a third pre-disciplinary action meeting to discuss the hospital's concerns regarding Wagner's work performance and unsafe patient care. *Id.* ¶ 37. The meeting focused on a litany of documented incidents, including: (1) sleeping at the nurses' station; (2) failing to answer patient call lights; (3) failing to accurately prepare and maintain patient charts; (4) failing to monitor an impulsive patient who pulled out his intravenous line; and (5) failing to comply with the hospital's infection control guidelines. Def. Facts ¶¶ 37-42; Def. Ex. A, Part 5 (Wagner Dep. Ex. 13). In one instance, Wagner disregarded the hospital's infection control policy, which required that blood containers be labeled and sealed at a patient's bedside in a biohazard bag. Def. Facts ¶ 42. She took an unsealed blood vial to the nurses' station, where she accidentally spilled it and made other nurses clean it up. *Id.* In light of Wagner's unsatisfactory performance, O'Neill issued her a second letter of warning on May 27, 2009.[4] *Id.* ¶ 43. Besides these incidents, the letter of warning also addressed Wagner's continuing tardiness problem. *Id.* Between December 16, 2008 and March 27, 2009, Wagner was late to work 31 times. Def. Ex. A, Part 5 (Wagner Dep. Ex. 13).

O'Neill continued to receive reports of substandard patient care on Wagner's part. In June 2009, Wagner failed to give medication to a kidney transplant patient, even though she

---

[4] Wagner argues, without explanation, that the letter of warning was "invalid." The only evidence proffered in support of her response is inadmissible hearsay. Pl. Resp. ¶ 43 ("The union informed [Wagner] that the letter of warning . . . was invalid").

5

documented on the patient's chart that she had done so. Def. Facts ¶ 50. Wagner failed to administer intravenous maintenance infusions and erroneously noted that another prescribed medication was unavailable. *Id.* With respect to another patient, Wagner failed to document vital signs and response to pain medication. *Id.* ¶ 52. Her tardiness also remained an issue, as she was late 13 times between June 3, 2009 and July 23, 2009. *Id.*

On August 5, 2009, O'Neill provided Wagner with notice of a scheduled meeting to discuss Wagner's ongoing performance issues, tardiness, and failure to abide by the hospital's patient documentation standards. Def. Facts ¶ 53. Wagner did not show up for the meeting. *Id.* ¶ 54. She maintains that she told the union of her need to reschedule the meeting, but admits that neither she nor the union advised the hospital that she would not attend. *Id.* ¶¶ 54-56. One week after Wagner failed to attend the scheduled meeting, O'Neill notified her that the hospital was terminating her employment. *Id.* ¶ 61; Def. Ex. A, Part 5 (Wagner Dep. Ex. 19). Wagner filed a race discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), and then brought this suit after receiving a right-to-sue letter from the EEOC. Def. Ex. A, Part 5 (Wagner Dep. Ex. 20).

## DISCUSSION

### I. Legal Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Board has the initial burden of demonstrating it is entitled to summary judgment. *Kramer v. Vill. of Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004). If the Board meets this burden, Wagner must go beyond

6

the pleadings and set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). A genuine issue of material fact requires more than some metaphysical doubt; Wagner must show there is evidence sufficient to support a reasonable jury verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine issue of fact exists, the court views the evidence and draws all reasonable inferences in Wagner's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

## II. Race Discrimination

Wagner alleges she was fired on account of her race, in violation of both Title VII and 42 U.S.C. § 1981. Title VII makes it unlawful for an employer to discriminate against an employee on the basis of race. 42 U.S.C. § 2000e-2. Section 1981 prohibits race discrimination in the making and enforcing of contracts. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999). Because both claims are subject to the same analytical framework, *id.*, the court does not address them separately. To prove her claims, Wagner may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Although Wagner insists that she can satisfy either standard, the summary judgment record is devoid of evidence sufficient to create a triable issue.

It must be noted at the outset that Wagner has *admitted*, perhaps only inadvertently, that she was terminated for what the hospital "considered to be continued poor work performance and failure to improve her patient care." Def. Facts ¶ 62; Pl. Resp. ¶ 62. This admission is seemingly fatal to her discrimination claims. *Richard v. LeSalle Talman Bank*, No. 94 C 1799, 1995 WL 234633, at *5 (N.D. Ill. Apr. 19, 1995) (Leinenweber, J.). However, Wagner disputes the

Board's contention that race played no factor in her termination. Def. Facts ¶ 72; Pl. Resp. ¶ 72. While the court is unsure what to make of Wagner's conflicting responses, it will resolve the conflict in her favor. Even without Wagner's tacit admission, the Board is still entitled to summary judgment.

The focus of the "direct" method of proof is not whether the evidence is direct or circumstantial, but whether it points *directly* to a discriminatory reason for the employer's action. *Atanus*, 520 F.3d at 671. In this case, the Board presents ample, documented evidence supporting O'Neill's decision to terminate Wagner's employment after a pattern of tardiness and substandard patient care that persisted over several years. Contrary to Wagner's assertion, she has not shown a "convincing mosaic of circumstantial evidence" from which a jury could infer intentional discrimination. *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Wagner must show what admissible evidence she has to persuade the trier of fact. *Eberts v. Goderstad*, 569 F.3d 757, 766-67 (7th Cir. 2009) (summary judgment is the "put up or shut up" moment). Wagner claims that she and others "witnessed the differential treatment of blacks and the disproportionate termination of black [nurses]." Pl. Memo. at 5. However, Wagner does not provide any specific facts to support her claim. Bare allegations are insufficient to prevent summary judgment. *Hildebrandt v. Ill. Dept. of Nat. Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003). Wagner submits the affidavit of another nurse, who states, "I have noticed that I, a black nurse, was treated differently than non-blacks in write ups and suspension." Pl. Ex. 2: Simmons Aff. ¶ 5. No facts are provided to bolster the affiant's subjective perception. Inferences and opinions must be grounded on more than "speculations, hunches, intuitions, or rumors." *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994).

Wagner's evidence purporting to show the disproportionate termination of African-American nurses is almost entirely hearsay.[5] Pl. Ex. 1: Wagner Aff. ¶ 4; Pl. Ex. 2: Simmons Aff. ¶ 2. The court cannot consider inadmissible hearsay evidence in assessing a summary judgment motion. *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001). Wagner swears, under penalty of perjury, that the hospital has not discharged any Caucasian nurses since 2002. Pl. Ex. 1: Wagner Aff. ¶ 5. Affidavits must be made on personal knowledge and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(e)(1). The basis of Wagner's knowledge is unknown, and no record evidence supports her assertion. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (self-serving affidavits, without record support, do not create a triable issue of fact). Moreover, the hospital's associate director of nursing attests that she has *personally* fired two Caucasian nurses over the past several years. Def. Ex B: O'Neill Aff. ¶ 29. The circumstances here simply do not support an inference that Wagner was terminated for discriminatory reasons.

Wagner's claims also fail under the indirect method of proving discrimination. Under this approach, Wagner must put forward a *prima facie* case by establishing that: (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845,

---

[5] The affidavits offered to substantiate Wagner's argument are prefaced with remarks such as "[t]he following persons [ ] told me . . .", "[a] co-worker told me . . .", or "[u]nion officials told me. . . ." Pl. Ex. 1: Wagner Aff. ¶ 4; Pl. Ex. 2: Simmons Aff. ¶ 2. Because the statements are offered to prove the truth of the matters asserted – that certain African-American nurses were fired – the statements are inadmissible hearsay. Fed. R. Evid. 801.

849-50 (7th Cir. 2010). Wagner's failure to establish any of these elements entitles the Board to summary judgment. *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 862 (7th Cir. 2005). If a *prima facie* case is made, the Board must offer a legitimate, nondiscriminatory reason for Wagner's termination. *Egonmwan*, 602 F.3d at 850. Wagner must then show that the stated reason is pretextual. *Id.*

Wagner has not satisfied the second and fourth elements of a *prima facie* case. Wagner argues she was meeting the hospital's legitimate expectations because she "only received one formal warning" and "was never suspended before being terminated." Pl. Memo. at 7. Wagner is wrong on the first point; she received *two* letters of warning. Def. Facts. ¶¶ 29, 43. She was also counseled numerous times for a consistent pattern of tardiness and substandard patient care. The mere fact that Wagner was not severely disciplined prior to termination is not sufficient to establish that she was meeting her employer's legitimate expectations.

Wagner also fails to offer evidence that similarly situated non-African American nurses were treated more favorably. A similarly situated employee is one who is directly comparable to Wagner in all material respects. *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). Wagner offers only conclusory allegations that nurses outside the protected class were treated more favorably regarding patient care issues and tardiness. She does not produce any evidence regarding the identity of these comparators, the nature of their duties, their disciplinary histories, or their supervisors. Without such a showing, Wagner cannot establish a *prima facie* case of discrimination. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740-41 (7th Cir. 2006) (plaintiff bears burden of finding others directly comparable in all material respects); *Oest v. Ill.*

10

*Dept. of Corrections*, 240 F.3d 605, 615 (7th Cir. 2001) (unsupported assertion that others were treated differently will not satisfy the similarly situated requirement).

Even assuming Wagner could establish a *prima facie* case, the Board offers legitimate, nondiscriminatory reasons for Wagner's termination, namely, Wagner's unsafe nursing practices and consistent tardiness. Under the burden-shifting approach, Wagner must produce enough evidence from which a trier of fact could infer that the Board's reasons were merely a pretext for discrimination. *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir. 1995). Nothing in the record suggests that the stated reasons for Wagner's termination were pretextual. Wagner does not dispute that the hospital received numerous complaints from patients, patients' family members, and other hospital staff regarding her conduct. She further admits having issues with frequent tardiness. *See Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) (decision to fire frequently tardy employee was not intentional discrimination). Although Wagner disputes the accuracy of the allegations made against her, the argument is inapposite. The question is not whether the hospital's reasons are correct, but whether they are honest. *Kariotis v. Navistar Int'l Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). Because all the evidence indicates the hospital terminated Wagner's employment after providing her many opportunities to improve her performance, Wagner has failed to provide evidence of pretext. The Board is entitled to summary judgment on Wagner's race discrimination claims.

### III.  Breach of Contract

Wagner alleges her discharge violated the progressive discipline policy set forth in a collective bargaining agreement ("CBA") between the Board and the Illinois Nurses

Association. *See* Def. Ex. A, Part 3-4 (copy of agreement). The Board argues that Wagner was not subject to the CBA or its progressive discipline policy. Even if she were subject to the CBA, the Board contends that summary judgment is warranted because she did not submit a grievance to arbitration as required by the CBA.[6] *See D'Amato v. Wis. Gas. Co.*, 760 F.2d 1474, 1488 (7th Cir. 1985) (failure to exhaust exclusive grievance and arbitration procedures established by CBA bars plaintiff's claim).

The Board insists that Wagner was hired as an "extra-help flex nurse," that such nurses are non-status appointments, as defined and recognized under the State Universities Civil Service Rules, and that those rules permit termination without progressive discipline. Def. Ex. B: O'Neill Aff. ¶¶ 8-9, 11. By its terms, the CBA applies to several categories of nurses, including "Staff Nurse I" and "Clinical Nurse Consultant II." Art. III § 1 (Def. Ex. A, Part 3). During Wagner's employment, hospital management sometimes referred to her as an "SN I" or "CN II," suggesting she fell within the above categories. Def. Ex. A, Part 5 (Wagner Dep. Exs. 3, 6). The CBA further provided that extra-help flex nurses were to be "classified as Staff Nurses I . . . *and shall be bargaining unit members*." Art. XIII § 1 (Def. Ex. A, Part 4) (emphasis added). Viewing the evidence in Wagner's favor, the court finds that she was included within the scope of the CBA and the agreed-upon progressive discipline policy.

---

[6] Prior to termination, Wagner was counseled numerous times about her inadequate work performance and was issued two letters of warning. The formal written warnings constitute "discipline" under the progressive discipline policy. *See* Art. VII § 1 of the CBA (attached as Def. Ex. A, Part 3). Wagner seemingly received the progressive discipline she claims was denied to her. Nevertheless, the Board does not address this issue. The court limits its consideration to the arguments offered by the Board in favor of summary judgment.

The CBA, however, provides a specific and exclusive grievance procedure for disputes over its interpretation or application. Art. VIII § 3 (Def. Ex. A, Part 4). The aggrieved party is required to submit a written grievance to the chief nursing officer. *Id.* The party may appeal an unsatisfactory resolution to a designated human resources director. *Id.* If the grievance is still not adequately resolved, the party may request that it be moved to arbitration. *Id.* If the decision is not appealed to arbitration within fifteen days, it is binding on the employee, the hospital, and the union. *Id.* The Board argues it is entitled to summary judgment because Wagner was required to exhaust this procedure if she objected to the hospital's application of the progressive discipline policy. *D'Amato*, 760 F.2d at 1488. Wagner does not argue that she ever exhausted the necessary grievance procedure. In fact, she offers no response to the Board's argument on this point. She has therefore waived any argument in opposition. *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1237-38 (7th Cir. 1997).

## CONCLUSION

For the reasons set forth above, the Board's motion for summary judgment is granted.

ENTER:

Suzanne B. Conlon
United States District Judge

August 26, 2010

13